AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 20 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

19MJ5155

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
)
Samsung Galaxy S6 Edge )
IMEI: 359718060762311 )
FP&P: 2020250600122301 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine and Heroin |

The application is based on these facts:

See attached affidavit of HSI Special Agent Zachary Bulman

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Zachary Bulman, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/20/19

*Judge's signature*

City and state: San Diego, California    Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Zachary Bulman, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

   a. Samsung Galaxy S6 Edge
      IMEI: 359718060762311
      FP&P: 2020250600122301
      **(Target Device)**

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section(s) 952 and 960, as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Anabel BRAMBILA-Ortiz for importing approximately 24.52 kilograms of methamphetamine and 3.18 kilograms of heroin from Mexico into the United States. *See U.S. v. Brambila-Ortiz*, Case No. 19-cr-4320 (S.D. Cal.) at ECF No. 1 (Complaint). The Target Device is currently in the evidence vault located at 2255 Niels Bohr Court, San Diego, California, 92154.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

4. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since August 2008. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United

1

Case 3:19-mj-05155-BGS   Document 1   Filed 11/20/19   PageID.3   Page 3 of 8

States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border. I am currently assigned to a Narcotics Group which primarily investigates violations of the United States Code that stem from the United States/Mexico International Border. During my assignment, I participated in the investigation of various drug-trafficking organizations involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. Because the nature of my ongoing work requires me to keep apprised of recent trends and developments involved in the investigations of drug traffickers, I regularly communicate with agents from the Drug Enforcement Administration (DEA), Customs and Border Protection (CBP), and other local and state law enforcement officers operating within the Southern District of California. During my tenure with HSI, I have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.

5. I have training and experience in multiple investigative areas, including training specifically focused on controlled substances and the smuggling and sales of controlled substances. I have been cross-designated by DEA to conduct narcotics investigations and enforce provisions of the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code. I was assigned to a border narcotics investigative group from September of 2011 to February of 2016. The border narcotics investigative group in which I was assigned focused specifically on the investigation of controlled substances being smuggled into the United States.

6. Prior to becoming a Special Agent with HSI, I was employed as a Police Officer with the Fairfax County Police Department in Fairfax, Virginia for six and a half years. I graduated from a POST-certified police academy in June of 2002 where I learned about the use and identification of various controlled substances.

7. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics

2

traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits narcotics traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to import methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to

3

       facilitate the importation of methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10.    On September 30, 2019, at approximately 7:00 a.m., BRAMBILA was in line to apply for permission to enter the United States at the Otay Mesa Port of Entry. BRAMBILA was the driver and sole occupant of a 2004 Acura MDX. At that time, a CBP Canine Enforcement Officer (CEO) and his Narcotics and Human Detection Dog (NHDD) were conducting pre-primary roving inspections, and the CBP CEO saw the NHDD alert to the exterior of BRAMBILA's vehicle. Following the alert, the CBP CEO directed BRAMBILA to pull forward to the primary inspection booth.

11.    At the primary inspection booth, BRAMBILA presented the CBPO with her identification documents and stated that her destination was Porterville, California. BRAMBILA told the CBPO that she had been visiting her boyfriend in Tijuana, Mexico, and that she had owned the vehicle for approximately one month. The CBPO received two negative declarations from BRAMBILA, and then conducted an inspection of the vehicle with the CBP CEO and his NHDD. The NHDD alerted to the area between the second and third row seats and the area around the sending unit. The CBPO then sent BRAMBILA to secondary inspection.

4

12. In secondary inspection, a government-contracted towing company removed the gas tank and discovered twenty-seven packages concealed inside. Twenty four of those packages weighed approximately 24.52 kilograms and field-tested positive for methamphetamine. Three of those packages weighed 3.18 kilograms and field-tested positive for heroin.

13. Later, agents read BRAMBILA her *Miranda* rights, and she agreed to speak to agents without an attorney present. BRAMBILA initially denied any knowledge of the drugs in her vehicle but admitted knowledge of something illegal being placed into the vehicle's gas tank. BRAMBILA admitted she was to be paid $1,800 dollars to smuggle unknown contraband into the United States. During the interview, BRAMBILA identified the **Target Device** as belonging to her.

14. In light of the above facts, BRAMBILA's statements, and my own experience and training, there is probable cause to believe that BRAMBILA was using the **Target Device** to communicate with others to further the importation of illicit narcotics into the United States.

15. In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as BRAMBILA, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on July 30, 2019, up to and including September 30, 2019, which was the day of BRAMBILA's arrest.

## METHODOLOGY

16. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is

subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17.     Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

//

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

19. At the time of BRAMBILA's entry into the United States, law enforcement officers conducted a manual review of the **Target Device** with the written consent and in the presence of BRAMBILA. I have not included any information obtained from that manual review in this affidavit and submit that probable cause exists to search the **Target Device** without that information.

## CONCLUSION

20. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of BRAMBILA's violations of Title 21, United States Code, Sections 952 and 960.

21. Because the **Target Device** was seized at the time of BRAMBILA's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from July 30, 2019, up to and including September 30, 2019.

22. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item(s) described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.



Zachary Bulman
HSI Special Agent

Subscribed and sworn to before me this __20__ day of November, 2019.

_____
Hon. Bernard G. Skomal
United States Magistrate Judge